UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x    **FOR PUBLICATION**
In re:                                                       :
THE 1031 TAX GROUP, LLC                                      :    Chapter 11
                                                             :    Case No. 07-11448 (MG)
                                        Debtor.              :    Jointly Administered
------------------------------------------------------------x
GERARD McHALE, JR., not individually but                    :
Solely in his capacity as Chapter 11 trustee for            :
THE 1031 TAX GROUP, LLC, *et al.*,                          :
                                        Plaintiff,           :
                                                             :    Adv. Pro. No.
       - v -                                                 :    09-01218 (MG)
                                                             :
CITIBANK, N.A.                                               :
                                                             :
                                        Defendants.          :
                                                             :
------------------------------------------------------------x

## OPINION & ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND

*A P P E A R A N C E S :*

SIDLEY AUSTIN LLP
*Attorneys for Defendant Citibank, N.A.*
One South Dearborn Street
Chicago, Illinois 60603
By:    Mark B. Blocker, Esq. (argued)

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
By:    Lee Stein Attanasio, Esq.
       Michael G. Burke, Esq.

SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
By:    John K. Van De Weert, Esq.

GOLENBOCK, EISEMAN, ASSOR BELL & PESKOE LLP
*Attorneys for the Chapter 11 Trustee*
437 Madison Avenue
New York, New York 10022
By:    David J. Eiseman, Esq. (argued)
       Jonathan L. Flaxer, Esq.
       Jacqueline G. Veit, Esq.
       Michael S. Devorkin, Esq.


**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is Citibank, N.A.'s ("Citibank") Motion to Dismiss or, in the

Alternative, to Stay the Complaint filed by Gerard A. McHale, the Chapter 11 Trustee

("Trustee") of The 1031 Tax Group, LLC and its related affiliates ("Debtors" or "1031

Debtors").  The Trustee alleges that Citibank aided and abetted Edward E. Okun ("Okun") in

misappropriating hundreds of millions of dollars held by the Debtors and deposited in accounts

at Citibank and other banks for use in completing real property exchanges for customers in

accordance with Section 1031 of the Internal Revenue Code.  Citibank's motion to dismiss is

principally based on application of the so-called *Wagoner* standing rule and its state-court

corollary, the *in pari delicto* doctrine.  Citibank argues that the Trustee stands in the shoes of the

Debtors, and that Okun's misconduct is imputed to the Debtors, thereby denying the Trustee

standing to assert the claims.  For the reasons explained below, the Court concludes that the

Complaint, as currently pleaded, must be dismissed.  Because it is possible that the deficiencies

in the Complaint can be cured, the Court dismisses the Complaint with leave to amend within 30

days from the entry of this Opinion and Order.

## BACKGROUND

### A. The Debtors' Business Operations and Reorganization Efforts

On May 14, 2007, The 1031 Tax Group, LLC and the other Debtors filed for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  The 1031 Tax Group, LLC is the direct or indirect parent of the other Debtors.  The Debtors were "qualified intermediaries," or "QIs," and were engaged in the business of providing custodial services to individuals and entities conducting property exchanges under § 1031 of the Internal Revenue Code.  The main purpose of a § 1031 like-kind exchange is to defer capital gains tax resulting from the sale of investment property.  As of the petition date, there were over 300 open exchange contracts with the Debtors, representing an estimated liability of $151 million.  In a typical § 1031 exchange transaction, the exchange participant sells an investment property, deposits the sale proceeds from the first property with a QI, within 45 days thereafter identifies and enters into a contract to purchase another investment property (with the closing of the purchase to occur within 180 days from the closing of the sale of the initial property), and then uses the funds deposited with the QI to close on the purchase of the new investment property.  The QI earns a fee for its services.  Exchange participants count on the proceeds from the sale of the initial properties to be safely held and available to close on the subsequent purchases.  The Debtors held (at least in theory) hundreds of millions of dollars of exchange participants' funds in the Debtors' bank accounts at Citibank and other banks.

Okun was the sole member of the main Debtor, The 1031 Tax Group, LLC, and was the sole manager or sole director of each of the Debtors.[1]  Okun was also the sole member of Investment Properties of America, LLC ("IPofA"), now also a debtor in this Court.  Okun used

---

[1]    *See* Memorandum Decision and Order Conditionally Granting Debtors' Motion for Entry of an Order Approving Consulting and Services Agreement Between the Debtors and Edward G. Moran LLC ("Memorandum Decision"), at 3–4 (Case No. 07-11448, ECF Doc. # 400).

funds he looted from the 1031 Debtors and transferred to IPofA, its affiliates and to himself to acquire real property, including shopping malls and warehouses. Okun also used looted funds to finance his lavish lifestyle, including purchases of numerous automobiles, airplanes, homes and yachts.

Okun acquired all of the Debtor entities between August 2005 and December 2006 with a business strategy of "rolling up" regional qualified intermediaries into a national firm. Okun acquired the following QIs on the following dates:

- Atlantic Exchange Co., LLC ("AEC") on August 25, 2005;

- Security 1031 Services, Inc. ("SOS") on November 15, 2005;

- Real Estate Exchange Co., LLC ("REES") on June 9, 2006;

- National Exchange Services QI, LLC ("NES") on June 22, 2006;

- Investment Exchange Group, LLC ("IXG") on August 1, 2006; and

- 1031 Advance Inc., on December 19, 2006.

Each of these QIs became a wholly-owned or indirect subsidiary of 1031 Tax Group. (Compl. ¶ 19.)

Contracts between the QIs and the exchange participants—known as exchange agreements—set out the responsibilities and obligations of the 1031 Debtors to their customers. (*Id.* ¶ 20.) These agreements required deposits to be used to effectuate 1031 exchanges ("Exchange Deposits"), and made promises regarding the safekeeping of such deposits. (*Id.*)

The Complaint alleges that from August 2005 through April 2007, Okun, in concert with others, misappropriated the 1031 Debtors' funds. (*Id.* ¶¶ 22–27.) Okun would acquire a QI and then transfer or cause the transfer of some or all of the Exchange Deposits held by the QI to

4

personal or business accounts controlled by Okun and his companies' officials.  Okun then took

the deposits in violation of his contractual and fiduciary duties.  (*Id.* ¶ 22.)

The Complaint alleges that the stolen funds were used to:

- fund Okun's lifestyle;

- pay monies and bonuses to other participants in the wrongdoing;

- make commercial real estate investments for Okun;

- acquire QIs and other companies which Okun then used to secure more loans;

- pay off lenders who provided loans secured by Okun's commercial properties;

- pay operating expenses for Okun's various companies;

- make "lulling" payments—using subsequently deposited funds to complete

    earlier exchange transactions—and otherwise conceal the wrongdoing.

(*Id.* ¶¶ 23–24.)

On March 17, 2008, a United States grand jury in the Eastern District of Virginia indicted

Okun, and on July 10, 2008, the grand jury issued a superseding indictment (the "Indictment").

The twenty-seven count Indictment charged Okun with mail fraud, wire fraud, money

laundering, and various counts of conspiracy.  On March 19, 2009, a jury convicted Okun on all

counts of the Indictment.  On August 5, 2009, the District Court sentenced Okun to a 100-year

prison term.  The grand jury also charged other employees of the Debtors—David Field, Lara

Coleman, and Richard Simring—with participating in Okun's criminal acts; these three

individuals have pleaded guilty.  Citibank was not charged with any crimes.

**B.  Citibank's Relationship with SOS and Knowledge of 1031 Transactions**

According to the Complaint, SOS used Citibank for its banking needs, and the two

developed a mutually beneficial marketing and banking relationship that began in 2004 and

continued until the Spring of 2007.  During this time, Todd Pajonas ("Pajonas"), SOS's

president, and SOS dealt primarily—and developed a close business relationship—with Citibank

employees Joe Curran ("Curran"), Tom Linehan ("Linehan"), and Jay McGetrick ("McGetrick").

Each of these employees worked in Citibank's Business Banking Division.  (Compl. ¶ 35.)  In

late 2005, SOS hired Barry Powlishen ("Powlishen") as SOS's Chief Operating Officer.  (*Id.* at ¶

36.)  Powlishen had worked in Citibank under Curran as SOS's account manager.  (*Id.*)

After Okun acquired SOS and made Pajonas president of SOS and AES in Fall 2005,

Citibank started conducting significant business with Okun and the 1031 Debtors.  Citibank and

Pajonas met frequently to discuss and implement joint marketing efforts to convince clients to do

business with SOS, AEC, and Citibank.  Pajonas and Citibank planned and sponsored joint

seminars where Citibank made presentations to potential SOS and AEC clients and referral

sources.  Citibank's pitches were followed by presentations by Pajonas or other SOS employees,

extolling the safety of accomplishing 1031 exchanges at SOS because, in part, the Exchange

Deposits were on deposit at Citibank.  (*Id.* ¶¶ 37–38.)  During this period, Citibank also met with

Okun to discuss, among other things, their joint marketing of 1031 exchange services.  (*Id.* ¶ 39.)

The Complaint alleges that due to Citibank's relationship with SOS, Okun, and Okun's

associates, the bank became well versed in the QI business.  Citibank allegedly understood how

QIs handled Exchange Deposits to ensure the deposits' security and availability to close

exchange transactions.  Citibank also supposedly knew that Exchange Deposits were supposed to

be maintained in secure accounts for a short term so they would be available for the exchanger to

purchase a replacement property no later than 180 days after selling an investment property.

Therefore, the funds were to be invested only in secure, short-term, liquid investments, and were

not to be used for purposes other than the completion of 1031 exchanges.  (*Id.* ¶¶ 40–41.)

*Citibank Expands Its Participation With The 1031 Debtors After Learning Of The Misconduct*

The Complaint alleges that Citibank employees were informed on several occasions that Okun was using the 1031 Debtors' Exchange Deposits to purchase real estate. According to the Complaint, Okun informed Curran, Linehan, and McGetrick on or about the time of his acquisition of SOS on November 15, 2005, of his plan to acquire QIs and borrow their Exchange Deposits to acquire real estate. (*Id.* ¶ 48.) The Complaint further alleges that Pajonas and Powlishen informed Curran, Linehan, and McGetrick at a September 28, 2006 meeting that Okun had borrowed—and was continuing to borrow—Exchange Deposits to buy real estate. Pajonas and Powlishen only revealed this information after Citibank inquired why the 1031 Debtors' QIs maintained low average daily balances on account at Citibank after their acquisitions. (*Id.* ¶¶ 45–47.)

The Complaint alleges that Citibank employees had misgivings about the legality of Okun's use of the 1031 Exchange Deposits to buy real estate, and even received explicit warnings that such activity was illegal. According to the Complaint, concerns expressed by Citibank employees prompted Pajonas and Powlishen to give assurances at the September 28, 2006 meeting that the borrowing and real estate investments were legal. (*Id.* ¶ 49.) The Complaint further alleges that on or about October 9, 2006, after receiving a legal memorandum indicating that Exchange Deposits could only be invested consistently with conducting a 1031 exchange, Pajonas contacted Citibank employees and warned them that Okun's borrowing of the 1031 Debtor's funds was illegal. Pajonas told Citibank that he was "getting out" of the company "and you need to get out as well." (*Id.* ¶¶ 50–51.)

The Complaint next alleges that, despite these warnings, Citibank maintained—and even deepened—its relationship with SOS and Okun. Citibank continued to plan joint seminars with SOS and designed a "national partnership" between The 1031 Tax Group and CitiMortgage.

Citibank also opened additional QI accounts in the name of "The 1031 Tax Group," with sub-accounts for the other 1031 Debtors designated as "doing business as" 1031 Tax Group. According to the Complaint, these additional accounts allowed Okun to transfer funds from Exchange Deposits held by one QI to close exchange transactions for exchangers of the other 1031 Debtors. (*Id.* ¶¶ 52–53.)

Terminated 1031 Tax Group employees allegedly delivered additional warnings of financial impropriety that Citibank continued to ignore. Okun fired Pajonas on November 30, 2006. Shortly thereafter, Pajonas contacted Curran to warn that Okun was using Exchange Deposits for personal purchases and investments. Despite the warning, and promises that an investigation would take place, Citibank and 1031 Tax Group continued to host joint seminars and events designed to market 1031 Tax Group's services to prospective clients. (*Id.* ¶¶ 54–58.) Moreover, the Complaint alleges that on February 12, 2007, Linehan, Curran, and McGetrick formally agreed to assist Okun in "migrating" the 1031 Debtors' funds deposited at Wachovia to Citibank in exchange for additional referrals of 1031 business from Citibank. (*Id.* ¶ 59.)

*Citibank Terminates Its Relationship With The 1031 Debtors*

On April 10, 2007, Citibank notified the 1031 Debtors that it intended to close the 1031 Debtors' accounts because the bank was "uncomfortable with continuing [their] relationship at this time" with the 1031 Debtors, and requested that the Debtors close all of their Citibank accounts by April 27, 2007. According to the Complaint, by giving the 1031 Debtors seventeen days to close their accounts instead of closing the accounts immediately, Citibank offered an open window for the 1031 Debtors to continue pilfering funds. Indeed, the Complaint alleges that between April 10, 2007 and April 27, 2007, Citibank made five wire transfers of Exchange

Deposits, totaling $1,778,266.30, to accounts where they would not be used to complete 1031 exchange transactions.  (*Id.* ¶ 60.)

All told, the Complaint alleges that between September 28, 2006—when Citibank's employees were first informed that Okun was improperly withdrawing funds to buy real estate— and April 27, 2007—when Citibank closed the 1031 Debtors' accounts—Citibank made 232 wire transfers of SOS funds, totaling $126,385,361.09, to outside accounts.  (*Id.* ¶ 62.)

### C.  Procedural History

The Trustee filed the Complaint against Citibank in this Court on May 13, 2009.  On June 23, 2009, this Court entered a Case Management and Scheduling Order requiring the parties to complete initial disclosures no later than July 6, 2009, and establishing a cut-off date for fact discovery of November 16, 2009.  Pursuant to a stipulation and order, Citibank's time to respond to the Complaint was extended to July 3, 2009.  On July 2, 2009, Citibank filed its motion to dismiss or, in the alternative, to stay the Complaint.  In a subsequent stipulation and order, the briefing schedule was adjusted so that the final brief would be due on September 2, 2009, and argument of the motion was scheduled for September 10, 2009.

In May 2009, Citibank was also named as a defendant in a putative class action filed on behalf of 1031 Tax Group exchange participants in the U.S. District Court for the Northern District of California, San Jose Division.  Both the California action and the adversary proceeding allege claims against Citibank for aiding and abetting a breach of fiduciary duty by Okun.  A separate putative class action had also been filed by 1031 Tax Group exchange participants in the U.S. District Court for the District of Massachusetts, although not at that time naming Citibank as a defendant.  The Judicial Panel on Multi-District Litigation ("MDL Panel") had already transferred the Massachusetts case to the Northern District of California for

coordinated pretrial proceedings. The MDL proceedings, designated as *In re Edward H. Okun Internal Revenue Service §1031 Tax Deferred Exchange Litigation,* MDL No. 2078, are pending before Judge James Ware.

On July 2, 2009, Citibank also filed in the U.S. District Court for the Southern District of New York a motion to withdraw the reference to the bankruptcy court and to transfer the adversary proceeding to the U.S. District Court for the Northern District of California. The motion to withdraw the reference was assigned to Judge Shira A. Scheindlin. I declined to stay the adversary proceeding pending consideration of the motion to withdraw the reference so briefing on the motion to dismiss and the motion to withdraw the reference both went forward. In addition to moving in the Southern District of New York to withdraw the reference and transfer the case to the Northern District of California, Citibank also moved before the MDL Panel to have the adversary proceeding designated as a tag-along action and have it transferred by the MDL Panel to the Northern District of California.

On August 24, 2009, Judge Scheindlin ruled on the motion to withdraw the reference and transfer the case to California. (*See* ECF # 23.) In a 30-page Opinion and Order, Judge Scheindlin denied the motion to withdraw the reference with leave to renew, and denied the motion to transfer the case to the Northern District of California with prejudice. In her written opinion, Judge Scheindlin specifically noted the discovery schedule established by this Court, and the pending motion to dismiss the adversary complaint.

On September 10, 2009, the Court heard argument on the motion to dismiss. During the argument the Court requested supplemental briefs from the parties. The last brief was filed on October 1, 2009, and the matter was taken under submission as of that date.

On October 6, 2009, the MDL Panel denied Citibank's motion to transfer the adversary proceeding to the Northern District of California as a tag-along action.

Finally, on October 21, 2009, the Court entered a stipulation and order modifying the earlier Case Management and Scheduling Order and, along with Judge Ware in the MDL proceeding, establishing a common discovery schedule in the adversary proceeding and the MDL proceeding, with a fact discovery cut-off date of May 10, 2010.  (*See* Stipulation and Amended Scheduling Order ¶ 3, ECF # 34.)

## DISCUSSION

### A.    Standard on a Motion to Dismiss[2]

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a Rule 12(b)(6) motion to dismiss "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009) (internal quotation marks omitted).  Courts deciding motions to dismiss must draw all reasonable inferences in favor of the nonmoving party and must limit their review to facts and allegations contained in (1) the complaint, (2) documents either incorporated into the complaint by reference or attached as exhibits, and (3) matters of which the court may take judicial notice. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  The

---

[2]    Citibank moves to dismiss the Complaint for lack of standing under Fed. R. Civ. P. 12(b)(6).  (*See* Notice of Motion to Dismiss or, In the Alternative, to Stay, ECF # 8.)  It is unsettled in this Circuit whether it is appropriate to move to dismiss for lack of standing under Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(b)(1). *Bartang Bank & Trust C. v. Caiola*, No. 04 Civ. 2402(DAB), 2006 WL 2708453, at *4 (S.D.N.Y. Sept. 18, 2006) ("It is unclear whether dismissal for lack of standing is properly raised in a Rule 12(b)(1) or Rule 12(b)(6) motion.").  This does not change the Court's analysis.  The standards governing motions to dismiss under both rules are "substantially identical." *Andrews v. Ford*, No. 08 CV 3938(LAP), 2009 WL 2870086, at *2 (S.D.N.Y. Sept. 2, 2009) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003) (Sotomayor, J.)). *But see infra* n.6.

court also considers documents not attached to the complaint or incorporated by reference, but "upon which [the complaint] *solely* relies and which *[are] integral to the complaint*." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (internal quotation marks omitted; emphasis in original) (quoting *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)); *see also Kalin v. Xanboo, Inc.*, No. 04 Civ. 5931(RJS), 2009 WL 928279, at *8 (S.D.N.Y. Mar. 30, 2009) (Sullivan, J.); *Grubin v. Rattet (In re Food Mgmt. Group, LLC)*, 380 B.R. 677, 690 (Bankr. S.D.N.Y. 2008) ("*Food Mgmt.*") (holding that a court may consider documents that have "not been incorporated by reference where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint") (internal quotation omitted).

When documents contain statements that contradict allegations in a complaint, the documents control and the court need not accept the allegations in the complaint as true. *Roth*, 489 F.3d at 510–11. Where allegations in the complaint conflict, or where a plaintiff's own pleadings are contradicted by other matter relied upon in drafting the complaint or incorporated into the complaint by reference, the court "is not obliged to reconcile plaintiff's own pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint." *Fisk v. Letterman,* 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005); *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07 Civ. 318(RJS), 2009 WL 2242605, at *26 (S.D.N.Y. 2009) (citing *Koulkina v. City of New York,* No. 06 Civ. 11357(SHS), 2009 WL 210727, at *6 (S.D.N.Y. Jan. 29, 2009)) (observing that where allegations within a complaint tend to contradict each other, courts need not accept the allegations as true).

Following the Supreme Court's recent decision in *Ashcroft v. Iqbal*, courts use a two-prong approach when considering a motion to dismiss. *See, e.g.*, *Weston v. Optima Commc'ns Sys., Inc.*, No. 09 Civ. 3732(DC), 2009 WL 3200653, at *2 (S.D.N.Y. Oct. 7, 2009) (Chin, J.)

(acknowledging a "two-pronged" approach to deciding motions to dismiss); *S. Ill. Laborers' and Employers Health and Welfare Fund v. Pfizer, Inc.*, No. 08 CV 5175(KMW), 2009 WL 3151807, at *3 (S.D.N.Y. Sept. 30, 2009) (Wood, J.) (same); *Inst. for Dev. of Earth Awareness v. People for the Ethical Treatment of Animals*, No. 08 Civ. 6195(PKC), 2009 WL 2850230, at *3 (S.D.N.Y. Aug. 28, 2009) (Castel, J.) (same). First, the court must accept all factual allegations in the complaint as true, discounting legal conclusions clothed in factual garb. *Iqbal*, 129 S.Ct. at 1949–50; *Boykin v. Keycorp*, 521 F.3d 202, 204 (2d Cir. 2008); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008). Second, the court must determine if these well-pleaded factual allegations "plausibly suggest an entitlement to relief." *Iqbal*, 129 S.Ct. at 1951.

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. Meeting the plausibility standard requires a complaint to plead facts that show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). A complaint that only pleads facts that are "merely consistent with a defendant's liability" does not meet the plausibility requirement. *Id.* (quoting *Twombly*, 550 U.S. at 557 (quotation marks omitted).

The Trustee's Complaint must also satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b). *Meisel v. Grunberg*, No. 07 Civ. 11610(PKL), 2009 WL 2777165, at *19 n.4 (S.D.N.Y. Aug. 31, 2009) ("[W]ith respect to aiding and abetting a breach of fiduciary duty, 'to the extent the underlying primary violations are based on fraud, the allegations of aiding

13

and abetting liability must meet the particularity requirements of Rule 9(b).'") (quoting *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996)).  Federal Rule of Civil Procedure 9(b) requires that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  FED. R. CIV. P. 9(b); *see also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (requiring that a plaintiff "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain the statements were fraudulent") (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  "The pleadings must adequately specify the statements that were allegedly false or misleading, provide particulars as to the alleged falsity of the statements, and state the time and place the statements were made and the identity of the persons who made them."  *Nisselson v. Softbank AM Corp. (In re Marketxt Holdings Corp.)*, 361 B.R. 369, 385 (Bankr. S.D.N.Y. 2007).

As a general matter, complaints cannot allege fraud on information and belief.  *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).  But courts grant bankruptcy trustees greater leeway than other litigants to satisfy the particularity requirements of Rule 9(b).  Because trustees do not witness the alleged frauds, and rely on second-hand knowledge when drafting their pleadings, courts permit trustees to plead fraud on information and belief.  *Nisselson v. Drew Indus. Inc. (In re White Metal Rolling and Stamping Corp.)*, 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998) ("Since a bankruptcy trustee rarely has personal knowledge of the events preceding his appointment, he can plead *scienter* based upon information and belief provided he pleads the basis of his belief.").  As the complexity and duration of the alleged fraud increases, courts afford bankruptcy trustees additional pleading

flexibility. *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999) ("When the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time, the trustee's handicap increases and courts, therefore, should afford him or her even greater latitude.").

In this case, except for the standing issue arising under the *Wagoner* rule, Citibank has not argued that the Complaint fails to plead a claim for aiding and abetting Okun's breach of fiduciary duty.[3]  The motion to dismiss focuses upon whether the facts pleaded in the Complaint, and other materials outside the Complaint that the Court may properly consider on a motion to dismiss, establish as a matter of law that the *Wagoner* rule applies, denying the Trustee standing to assert the claim against Citibank, and requiring dismissal of the Complaint.

### B. Choice of Law

Citibank argues—and the Trustee does not dispute—that New York law governs this dispute.  In fact, the Trustee's opposition papers overwhelmingly rely on New York law.  Where, as here, the "parties' briefing assumes that New York law controls an issue, then the parties implicitly consent to the use of New York law to decide the issue, which is sufficient to establish choice of law." *First Indem. of America Ins. Co. v. Shinas*, No. 03 Civ. 6634(KMW)(KNF), 2009 WL 3154282, at *5 n.7 (S.D.N.Y. Sept. 30, 2009) (citing *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) (employing New York law to resolve contract claim where parties' moving papers relied upon New York law)).

---

[3]        A claim for aiding and abetting a breach of fiduciary duty under New York law must allege facts that indicate (1) the breach of a fiduciary duty, (2) knowing participation in the breach, and (3) damages proximately caused by the breach.  *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006); *Kolbeck v. LIT America, Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996).  To the extent that the alleged fiduciary breach involves fraud, the plaintiff must also plead the aiding and abetting claim with particularity pursuant to FED.R.CIV.P. 9(b).  *See Kolbeck*, 939 F. Supp. at 245; *Frota v. Prudential-Bache Secs., Inc.*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) (applying Rule 9(b) to claim for aiding and abetting fiduciary duty based on securities-law fraud).

C.      Standing

Citibank maintains that the Trustee does not have prudential standing under the Second

Circuit's *Wagoner* doctrine to maintain this case.  (Citibank Br. 13–14.)  The parties devoted

many pages to this issue in their briefs.  (*Id.*; Trustee Opp. 9–22.)  The Court, however, was not

satisfied that the question of constitutional standing was adequately addressed and directed the

parties to submit additional briefing on that issue.  (*See* Citibank Supp. Br.; Trustee Supp. Br.)

Standing is a threshold issue for this Court.  If a plaintiff does not have standing, a court

has no subject matter jurisdiction to hear the case.  *Cent. States Se. & Sw. Areas Health &*

*Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005)

("'Without jurisdiction a court cannot proceed at all in any cause.  Jurisdiction is power to

declare the law, and when it ceases to exist, the only function remaining to a court is of

announcing the fact and dismissing the case.'") (quoting *Steel Co. v. Citizens for a Better Env't*,

523 U.S. 83, 94 (1998)).

Standing involves two distinct theories.  *Bennett v. Spear*, 520 U.S. 154, 162 (1997);

*Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000) (quoting *Lamont v. Woods*, 948

F.2d 825, 829 (2d Cir. 1991) ("The doctrine of standing incorporates both constitutional and

prudential limitations on federal court jurisdiction.")).  First, a court must determine whether a

plaintiff satisfies the "case or controversy" requirement of Article III of the United States

Constitution.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Second, a court must

determine whether a plaintiff satisfies court-created prudential limits on the exercise of judicial

power.  *Spear*, 520 U.S. at 162.  These so-called "prudential standing" rules are "judicially self-

imposed limits on the exercise of federal jurisdiction," *Selevan v. N.Y. Thruway Auth.*, 584 F.3d

82, 91 (2d Cir. 2009), and exist to preserve "the proper—and properly limited—role of courts in

a democratic society." *Spear*, 520 U.S. at 162 (quoting *Warth v. Seldin*, 422 U.S. 460, 498 (1975)).

### 1. Constitutional Standing

Here, the Trustee alleges that Citibank aided and abetted in breaches of fiduciary duty committed by Okun against the 1031 Debtors. (Compl. ¶¶ 1–2, 66–68.) The Trustee claims that Citibank's actions (i) deprived the 1031 Debtors of funds, (ii) drove the 1031 Debtors out of business and into bankruptcy, (iii) subjected the 1031 Debtors to legal claims from over 300 creditors, and (iv) caused the 1031 Debtors to incur substantial professional fees for accountants and attorneys. (*Id.* at ¶ 69.) The Trustee argues that these allegations satisfy constitutional standing requirements. (Trustee Supp. Br. 1–4.) Citibank, not surprisingly, disagrees. Citibank argues that the Trustee fails to allege an injury unique to the 1031 Debtors. Citibank maintains that the Trustee complains of injuries suffered by customers of the 1031 Debtors, not the 1031 Debtors themselves, stripping the Trustee of Article III standing. (Citibank Supp. Br. 3.) The Court is satisfied that the Trustee has constitutional standing to bring the Complaint. But, the Court finds the Trustee oversteps constitutional bounds to the extent he seeks to recover money owed to the exchange participants of the 1031 Debtors.

The Trustee must demonstrate three elements to establish constitutional standing. First, there must be an "injury in fact." That is, he must demonstrate a "concrete and particularized" violation of a legally protected interest that is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation and quotation marks omitted). Second, the Trustee must show a causal connection between the complained of conduct and the alleged injury. *Id.*; *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 489 (2d Cir. 2009). Third, a favorable decision for the Trustee must likely resolve the alleged injury. *Lujan*, 504 U.S. at 560–61;

*Cooper*, 577 F.3d at 489.  The burden to demonstrate standing falls on the Trustee.  *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) ("The burden to establish standing remains with the party claiming that standing exists.").

A bankruptcy trustee stands in the shoes of the debtor and "can only assert claims that the debtor could have asserted prior to filing for bankruptcy."  *Wornick v. Gaffney*, 544 F.3d 486, 490 (2d Cir. 2008); *Buchwald v. Renco Group, Inc. (In re Magnesium Corp. of Am.)*, 399 B.R. 722, 757 (Bankr. S.D.N.Y. 2009) (Gerber, J.).  As a general matter, bankruptcy trustees do not have standing "to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself."  *Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.)*, 336 F.3d 94, 99–100 (2d Cir. 2003) ("*Bennett Funding*") (quoting *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991)); *Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 428 (1972) ("[N]owhere in the [bankruptcy] statutory scheme is there any suggestion that the trustee in reorganization is to assume the responsibility of suing third parties on behalf of [creditors].").

Courts look to state law to determine which claims belong to the estate and thus can be asserted by a trustee.  *Mediators, Inc. v. Manney (In re The Mediators, Inc.),* 105 F.3d 822, 825 (2d Cir.1997) ("*Mediators*") ("In a bankruptcy proceeding, state law determines whether a right to sue belongs to the debtor or to the individual creditors."); *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700 (2d Cir. 1989) ("We agree with those courts that have held that the determination of whether a claim may be brought by a creditor of a bankrupt corporation outside of the bankruptcy proceedings depends on an analysis of state law.  Under the Bankruptcy Code, the bankruptcy trustee may bring claims founded, *inter alia,* on the rights of the debtor and on certain rights of the debtor's creditors, *see, e.g.,* 11 U.S.C. §§ 541, 544, 547

(1982 & Supp. V 1987).  Whether the rights belong to the debtor or the individual creditors is a question of state law.") (citation omitted)); *Food Mgmt.*, 380 B.R. at 694 ("Whether the rights belong to the debtor or the individual creditors is a question of state law.") (quoting *Hirsch*, 72 F.3d at 1093); *Goldin v. Primavera Familienstiftung (In re Granite Partners L.P.)*, 194 B.R. 318, 324−25 (Bankr. S.D.N.Y. 1996) ("*Granite Partners*") ("State law determines which claims belong to the estate, and hence, can be asserted by the trustee.  If the cause of action belongs to the estate, the trustee has exclusive standing to assert it; conversely, if the cause of action belongs solely to the shareholders or creditors, the trustee has no standing to assert it.") (citations and footnote omitted).

Determining under state law whether a claim belongs to the company or to its creditors can be tricky, particularly where the answer depends upon the application of the *in pari delicto* state law defense.  For example, claims for aiding and abetting breach of fiduciary duty against corporate owners generally belong to the corporation, and therefore to the bankruptcy trustee.  *In re Magnesium Corp.*, 399 B.R. at 760 ("Likewise, as a purely analytic matter (once more before being trumped by some of *Wagoner's* progeny), claims for *aiding and abetting* those breaches of fiduciary duty belong to the corporations to whom the fiduciary duties were owed, and unless the applicable state law grants creditors special rights, not to individual creditors.  The underlying injury is the same, as are the relevant duties.  As a purely analytic matter, claims for aiding and abetting breaches of fiduciary duty belong to the estate, just as claims for the underlying breaches do.") (footnote omitted).  But, if *in pari delicto* applies, where the company (or a chapter 11 trustee, standing in the shoes of the company) is in equal fault, under state law the cause of action may belong to the creditors rather than the company to pursue a claim for damages particular to the creditors.  *See Bennett Funding*, 336 F.3d at 102 (applying New York

law); *Hirsch*, 72 F.3d at 1093 (applying Connecticut law); *Wagoner*, 944 F.2d at 120 ("A claim against a third party for defrauding a corporation with the cooperation of management, accrues to creditors, not to the guilty corporation.") (applying New York law). The problem is that exceptions to the application of *in pari delicto* (*e.g.*, adverse interest exception, sole actor rule, and innocent insider exception to the sole actor rule, *see infra* Section C.2.b. & c.), can make it exceedingly difficult to resolve a case on a motion to dismiss for lack of standing, the nomenclature applied using the minority *Wagoner* standing rule followed in the Second Circuit.

While the Trustee may bring this claim for aiding and abetting breach of fiduciary duty against Citibank, he does not have constitutional standing to recover damages for injuries that are particular to creditors. Specifically, the Trustee does not have constitutional standing to recover from Citibank money lost by the 1031 Debtors' exchange participants who were waiting to complete their 1031 exchange transactions when Okun looted funds from the Citibank bank accounts. Courts in this Circuit have consistently rejected attempts by trustees to assert claims for injuries that are particularized to creditors. *See, e.g.*, *Hirsch*, 72 F.3d at 1093 (holding that a bankruptcy trustee is barred from pursuing claims for injuries particularized to certain creditors); *Picard v. Taylor (In re Park S. Secs., LLC)*, 326 B.R. 505, 514 (Bankr. S.D.N.Y. 2005) (rejecting trustee's unjust enrichment claims for lack of standing where the claim was particular to certain creditors).[4]

---

[4]    *See, e.g.*, *Pereira v. Cogan*, No. 00 Civ. 619(RWS), 2001 WL 243537, at *11 (S.D.N.Y. Mar. 8, 2001) ("A bankruptcy trustee lacks standing to bring an action on behalf of an individual creditor with a particularized injury. However, where the injury is to all creditors as a class, it is the creditors who lack standing and the Trustee who may bring a claim based on that generalized injury.") (citations omitted); *see also Granite Partners*, 194 B.R. at 325 ("Where a corporation suffers an injury, and the shareholders suffer solely through a diminution in the value of their stock, the claim belongs to the corporation. . . . . A shareholder who suffers an injury particular to itself can maintain an individual action even though the corporation also suffers an injury from the same wrong. The shareholder may, however, have to await the bankruptcy court's disposition of the common claim since the shareholder cannot measure its injury until then.") (citations omitted).

The Trustee argues, however, that the funds Okun looted from the Citibank accounts were the Debtors' funds, thereby conferring constitutional standing on the Trustee, even if the money originated from exchange participants and the disappearance of the funds ultimately damaged exchange participants who could not close on the purchase of replacement investment property.  Who had title to or an equitable interest in the funds may be relevant to issues such as whether the funds were property of the estate under Bankruptcy Code § 541, or whether creditors can assert a conversion claim, but ownership of the funds does not necessarily determine who can assert a damages claim for aiding and abetting breach of fiduciary duty.  *See McHale v. Alvarez (In re The 1031 Tax Group, LLC)*, 397 B.R. 670, 678−79, 683 (Bankr. S.D.N.Y. 2008) (concluding that exchange participants could not bring conversion claim because the funds deposited in accounts at Colorado Capital Bank were property of the estate and under Colorado law creditors may not assert conversion claims based on general looting of bank accounts).  "To determine standing, the Court must look to the underlying wrongs as pleaded in the complaint and whether the plaintiff alleges a particularized injury."  *Id.* at 679 (citing *In re Johns-Manville Corp.,* 517 F.3d 52, 63 (2d Cir. 2008) and *Granite Partners,* 194 B.R. at 325).

Courts have good reason to reject a trustee's attempt to recover damages for injuries particular to creditors.  When a party lacks a personal stake in the outcome of a matter, the party does not meet the Constitution's case or controversy requirement.  *Bennett Funding*, 336 F.3d at 101.  To the extent customers of the Debtors were injured by Citibank's alleged wrongdoing, the Trustee has not suffered a concrete injury that the Court may redress.  *Id.* at 101–02 (observing that a trustee does not have constitutional standing to assert damage claims for creditors against third parties); *In re Park S. Secs., LLC*, 326 B.R. at 514 (finding that a bankruptcy trustee lacked constitutional standing to assert unjust enrichment claims on behalf of customers and not the

estate).  Moreover, it is highly unlikely that a successful suit by the Trustee would resolve

injuries suffered by the customers of the 1031 Debtors.  *Lujan*, 504 U.S. at 560.  No matter how

the Trustee's suit is resolved, the injured customers would in all likelihood still have claims for

their injuries, although the amount of their damages may not be fixed until distributions from the

now-confirmed chapter 11 plan are fixed.  *Cf. Bankers Trust Co. v. Rhoades,* 859 F.2d 1096,

1106 (2d Cir. 1988) (corporate creditor asserting RICO claim against corporate debtor's

principals must await bankruptcy court's disposition of trustee's claim based on same wrongful

conduct—through recovery of the transferred assets, abandonment or some other means—before

the creditor's claim will accrue); *Granite Partners*, 194 B.R. at 325 ("The shareholder may,

however, have to await the bankruptcy court's disposition of the common claim since the

shareholder cannot measure its injury until then.").

Indeed, exchange participants have filed several class actions against Citibank and other

defendants, currently pending in the United States District Court for the Northern District of

California.  The Judicial Panel on Multi-District Litigation has ordered the class actions

coordinated for pretrial purposes before Judge James Ware.  *See Hunter v. Citibank N.A.*, No.

09-cv-02079-JW (N.D. Cal.) (Ware, J.).  An agreement between the Trustee in this case and

counsel for the class plaintiffs (exclusively consisting of the Debtors' exchange participants) in

the MDL proceeding has been approved by this Court and by Judge Ware, providing for

cooperation between plaintiffs' counsel and sharing of any recovery by the class plaintiffs and

the Debtors' estate.  (*See* Order Approving Agreement Among the Trustee and the Class

Representatives, Case No. 07-11448, ECF # 1597.)  Both courts have approved case

management orders providing for coordinated discovery in the MDL proceedings and in this

case. (*Compare* Stipulation and Amended Scheduling Order ECF # 34 *with* Scheduling Order,

*Hunter v. Citibank N.A.*, No. 09-cv-02079-JW (Oct. 16, 2009).)[5]

Despite the Trustee's lack of constitutional standing for injuries particular to exchange

participants of the 1031 Debtors, the Trustee has Article III standing for damages suffered by the

Debtors as a result of Citibank's alleged aiding and abetting of Okun's breach of fiduciary duty.

*American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F. Supp. 2d 79

(S.D.N.Y. 2004), demonstrates this principle well. Judge Lynch analyzed claims brought by a

debtor-in-possession, American Tissue Inc. ("ATI"), against its former investment bank and

financial consultant, Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ"). ATI alleged,

*inter alia*, malpractice, breach of fiduciary duty, and breach of contract claims against DLJ in

connection with corporate advice and accounting services. *Id.* at 87. Judge Lynch determined

that ATI lacked constitutional standing on these claims to the extent that ATI sought to recover

money owed to creditors. *Id.* at 89–91 (citing *Hirsch*, 72 F.3d at 1093). Still, the district court

was careful to indicate that ATI had constitutional standing to bring claims for injuries that it

itself allegedly suffered at the hands of DLJ. *Id.* at 90.

Here, just as in *American Tissue*, the Trustee has brought a claim that seemingly includes

damages that are unique to individual creditors. In *American Tissue*, Judge Lynch refused to

permit a debtor in possession to recover for liabilities the company incurred to creditors as a

result of alleged malpractice. *Id.* Here, the Trustee is attempting nearly the same gambit. The

Trustee seeks to recover damages for being "subjected to claims by more than 300 creditors

whose 1031 Exchanges were not completed." (Compl. ¶ 69.) Just as the debtor in *American*

*Tissue* did not have constitutional standing to bring claims for damages to creditors, here, too, the

---

[5]        The Judicial Panel on Multidistrict Litigation has consolidated an additional matter, *Quirk Infinity, Inc. v. Wachovia Bank, N.A.*, No. 08-CV-12060 (D. Mass), before Judge Ware in *Hunter* for pretrial purposes.

Trustee lacks Article III standing to bring this claim to the extent it requests damages for money owed to the exchange participants of the 1031 Debtors.  The Trustee, however, has constitutional standing to seek to recover damages Citibank's alleged aiding and abetting caused the company to incur, such as fees paid to Citibank and costs associated with investigating Citibank's conduct, *see Food Mgmt.*, 380 B.R. at 700, so long as those damages (i) may be traced to Citibank, and (ii) injured the Debtors and not its creditors.  *American Tissue*, 351 F. Supp. 2d at 91.

Likewise, the Trustee has constitutional standing to recover funds belonging to the 1031 Debtors that Citibank allegedly aided and abetted Okun in looting, to the extent this alleged injury is separate from the injury to the creditors.  For example, even if the exchange participants own the claims against Citibank for loss of their Exchange Deposits, the Debtors have constitutional standing to assert claims against Citibank to the extent the looted funds belonged to the Debtors as a result of revenue earned from exchange transactions.  Certainly, there can be no double recovery of funds.  It is unnecessary at this stage of the case to parse with precision for what injury the Trustee may seek to recover.  But, as discussed below, the constraints imposed on the Trustee by prudential standing may be more demanding in any event.

### 2. *Prudential Standing /* Wagoner *Rule /* In Pari Delicto *Doctrine*

Citibank devotes the majority of its moving papers to challenging the Trustee's ability to assert his claims under the so-called *Wagoner* rule or the closely related *in pari delicto* doctrine. Citibank argues that these concepts bar the Trustee from recovering on behalf of the 1031 Debtors because of Okun's prior bad acts.  Citibank maintains that agency law principles impute Okun's fraud to the 1031 Debtors.  Thus, Citibank argues, the Trustee, standing in the shoes of the Debtors, does not have standing to maintain his claim under the *Wagoner* rule and also cannot succeed on his claim due to the equitable principles of the *in pari delicto* doctrine.

The *Wagoner* rule is a prudential standing rule first articulated by the Second Circuit in

1991. *See Wight*, 219 F.2d at 86–87 (implicitly linking the *Wagoner* rule to prudential standing).

In *Wagoner,* the court stated that "when a bankrupt corporation has joined with a third party in

defrauding its creditors, the trustee cannot recover against the third party for the damage. 944

F.3d at 118. Since *Wagoner*, courts in this Circuit have consistently held that bankrupt

corporations, and trustees standing in the shoes of the bankrupt corporation, lack standing to

assert claims against third parties for assisting in defrauding the company where corporate

management conducted the alleged fraud. *See Bankruptcy Services, Inc. v. Ernst & Young (In re

CBI Holding Co.)*, 529 F.3d 432, 447 (2d Cir. 2008) ("*CBI*") (quoting *Wagoner*, 944 F.2d at

120); *Bennett Funding*, 336 F.3d at 99–100; *Wight*, 219 F.3d at 86–87 ("Because management's

misconduct is imputed to the corporation, and because a trustee stands in the shoes of the

corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself

essentially took part in."); *Cobalt Multifamily Investors I, LLC v. Shapiro*, No. 06 Civ.

6468(KMW)(MHD), 2009 WL 2058530, at *3 (S.D.N.Y. July 15, 2009).

*In pari delicto*, on the other hand, is an equitable defense to liability. *Food Holdings Ltd.

v. Bank of America Corp. (In re Parmalat Sec. Litig.)*, 477 F. Supp. 2d 602, 609 n.45 (S.D.N.Y.

2007) (finding the doctrines "quite similar" but acknowledging distinctions). The doctrine is a

state law equitable defense similar to the unclean hands doctrine. *Food Mgmt.*, 380 B.R. at 693.

*In pari delicto* is grounded in the equitable concept that "a plaintiff's recovery may be barred by

his own wrongful conduct." *Pinter v. Dahl*, 486 U.S. 622, 632 (1988). The doctrine exists

because, as a matter of equity, courts should not help plaintiffs profit from their wrongdoings.

*Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990). "It is not enough that both parties are at fault,

or *in delicto*—they must be equally at fault, or *in pari delicto*." *Grumman Olson Indus. v. McConnell (In re Grumman Olson Indus., Inc.)*, 329 B.R. 411, 424 n.5 (Bankr. S.D.N.Y. 2005).

The two concepts are similar and are both grounded in common law agency principles. *Wight*, 219 F.3d at 86 (noting that the *Wagoner* rule is derived from common law agency principles); *Kirschner v. Grant Thornton LLP*, No. 07 Civ. 11604(GEL), 2009 WL 1286326, at *5 n.13 (S.D.N.Y. Apr. 14, 2009) (acknowledging that the *Wagoner* rule and the *in pari delicto* doctrines are similar); *Food Mgmt.*, 380 B.R. at 693 (noting that agency principles underlie both the *in pari delicto* doctrine and the *Wagoner* rule). The parties acknowledge these similarities and treat the doctrines interchangeably in their briefing. (*Compare* Citibank Br. 13–14 *and* Citibank Reply Br. 4–8 *with* Trustee Opp. 9–22.)

Despite the near total congruency of the two concepts, courts in this Circuit have carefully separated the doctrines, keeping them distinct. *Food Mgmt.*, 380 B.R. at 693 ("The *in pari delicto* doctrine and a party's standing to sue under *Wagoner* represent separate and distinct legal principles . . . ."). Still, the First, Third, Fifth, Eighth, and Eleventh Circuits do not follow the Second Circuit's approach and have refused to create a separate standing rule to address matters that could be addressed by a pre-existing equitable defense. *In re Senior Cottages of America, LLC*, 482 F.3d 997, 1004 (8th Cir. 2007) (analyzing circuit split and refusing to create a separate *Wagoner* standing rule). These circuit courts reason that "standing does not include an analysis of equitable defenses, such as *in pari delicto*. Whether a party has standing to bring claims and whether a party's claims are barred by an equitable defense are two separate questions, to be addressed on their own terms." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 346 (3rd Cir. 2001). Despite the strength of the criticism of

the *Wagoner* standing rule, leaving the Second Circuit in the minority, this Court is, of course, bound to follow Second Circuit precedent unless and until that court changes its views.[6]

Regardless of this debate, because both doctrines are grounded in substantive agency law, and identical tests appear to apply to both doctrines, this Court will analyze Citibank's *in pari delicto* and *Wagoner* rule arguments together. *See Food Mgmt.*, 380 B.R. at 692–701 (analyzing *in pari delicto* and *Wagoner* arguments simultaneously); *Grumman Olson*, 329 B.R. at 424 n.5 (observing that courts sometimes treat the *in pari delicto* doctrine and the *Wagoner* rule identically).

---

[6]     In *Lerner*, 318 F.3d at 120−24, the Second Circuit confronted the issue whether a RICO claim should be dismissed for lack of standing under Rule 12(b)(1), as the district court had ruled, or under Rule 12(b)(6), for failure to state a claim.  The court recognized a circuit split concerning a "zone of interests" standing test for application of the RICO statute.  Judge Sotomayor (as she then was) treated and decided the case on the adequacy of pleading of proximate cause under Rule 12(b)(6) and "encourage[d] district courts to follow this approach in future opinions addressing RICO standing issues." *Id.* at 122. *Lerner* was decided well-after *Wagoner* (1991); *Hirsch* (1995); *Mediators* (1997); and *Wight* (2000), all of which recognized and applied the *Wagoner* standing rule. *Lerner* was decided before *Bennett Funding* (2003) and *CBI* (2008), but neither case considered whether *Lerner* counseled a different approach to the standing issue.

In *Bennett Funding*, 336 F.3d 94, the Second Circuit affirmed the district court's grant of summary judgment dismissing the complaint on standing grounds (after a four-day evidentiary hearing) and one-year after the district court had denied a motion to dismiss on the basis of standing.  The Second Circuit applied the *Wagoner* standing rule in reaching its decision, but did not consider whether the same result would have been reached on the merits of the *in pari delicto* defense asserted by the defendant.  In *CBI*, the parties did not dispute that if the *Wagoner* rule applied, the plaintiff lacked standing to assert CBI's claims against the accounting firm for fraud, negligence and breach of contract in connection with its 1992 and 1993 fiscal audits.  The parties' dispute focused solely on whether, applying imputation principles, any exception to the *Wagoner* rule barred imputation. *CBI*, 529 F.3d at 447.  Because the court found that the adverse interest exception was satisfied, it concluded that the plaintiff had standing. *Id.* Since the the Second Circuit concluded as had the bankruptcy court that the exception applied permitting the trustee to maintain the claims, the court had no reason to reexamine whether *Wagoner* should continue to impose a standing rule or, as in *Lerner*, whether the better approach is to examine the issue as a Rule 12(b)(6) pleading requirement.

Sister courts have also started to question the Second Circuit's approach.  In *Magnesium Corp. of America*, 399 B.R. at 762–64, Judge Gerber questioned the continuing validity of distinguishing between the *in pari delicto* doctrine and the *Wagoner* standing rule and indicated that he would welcome guidance from both the Second Circuit and the New York Court of Appeals on the issue.

a.    The *Wagoner* Rule / *In Pari Delicto* Apply to the Trustee's Claim

A bankruptcy "trustee stands in the shoes of the bankrupt corporation." *CBI*, 529 F.3d at

447 (quoting *Wagoner*, 944 F.2d at 120).  A trustee takes title to the corporation's legal claims,

which remain subject to all defenses available before bankruptcy.  *Food Mgmt.*, 380 B.R. at 693–

94.  Thus, any wrongdoing imputed to the company under a theory of agency also taints the

trustee's claims.  Imputation of wrongdoing to the corporation and later to the trustee is the

rationale for the *Wagoner* rule.  "Because management's misconduct is imputed to a corporation,

and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from

suing to recover for a wrong that he himself essentially took part in." *Wight*, 219 F.3d at 87.

Similarly, the *in pari delicto* doctrine uses agency determinations to determine if a plaintiff

should be prohibited from recovering damages due to his equal fault.  *LaSala v. Bank of Cyprus

Public Co. Ltd.*, 510 F. Supp. 246, 278 (S.D.N.Y. 2007).[7]

It is a "fundamental principle of agency that the misconduct of managers within the scope

of their employment will normally be imputed to the corporation." *Wight*, 219 F.3d at 86.  This

is because of the presumption that agents disclose all information to their principals and so "any

misconduct engaged in by a manager is with—at least—his corporation's tacit consent." *CBI*,

529 F.3d at 448 (citing *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784, 497 N.Y.S.2d

898, 488 N.E.2d 828 (1985)).

Examining the Trustee's Complaint, there is no doubt that Okun was acting within the

scope of his employment with the 1031 Debtors.  The Complaint clearly indicates that Okun

---

[7]    Neither the *Wagoner* rule nor the *in pari delicto* doctrine would bar direct claims by the Trustee against
Okun or other insiders for breach of fiduciary duty.  *Food Mgmt.*, 380 B.R. at 695 n.10.  Corporations retain direct
causes of action against unfaithful insiders.  *Granite Partners*, 194 B.R. at 332 ("*In pari delicto* bars claims against
third parties, but does not apply to corporate insiders or partners.  Otherwise, a trustee could never sue the debtor's
insiders on account of their own wrongdoing.").  This case does not require the Court to address direct claims the
Trustee has against insiders for breach of fiduciary duty.

misappropriated funds to acquire additional QIs for the 1031 Tax Group and that the stolen funds were used to pay company operating expenses and to complete transactions to perpetuate the fraud.  (Compl. ¶ 23.)  Tellingly, the Trustee does not argue that Okun was acting outside the scope of his employment when defrauding the company.  (Trustee Opp. 9–10.)  Instead, the Trustee claims that the so-called "adverse interest exception" to the general *Wagoner* rule and *in pari delicto* doctrine precludes the imputation of Okun's bad acts to the 1031 Debtors.  Unless this exception applies, the *Wagoner* rule bars (i) the Trustee's standing to bring his claim and (ii) all recovery by the Trustee against Citibank.

### b.    The Adverse Interest Exception

The adverse interest exception rebuts the usual presumption that the bad acts of managers acting within the scope of their employment are imputed to the corporation.  *CBI*, 529 F.3d at 448; *Mediators*, 105 F.3d at 827 ("Under New York law, the adverse interest exception rebuts the usual presumption that the acts and knowledge of an agent acting within the scope of employment are imputed to the principal.").  The rationale for the exception is that, while an agent is typically presumed to disclose all relevant facts to his principal, when a manager is defrauding a company, the company cannot be presumed to have known of the fraud.  *See id.* "The theory is that where an agent, though ostensibly acting in the interest of the principal, is really committing a fraud for his own benefit, he is acting outside the scope of his agency, and it would be most unjust to charge the principal with knowledge of it."  *Wight*, 219 F.3d at 87.

The exception, however, is not broad; it only applies when the guilty manager has "totally abandoned" the interests of the corporation.  *CBI*, 529 F.3d at 448.  The Trustee argues that Okun's actions, as pleaded in the Complaint, demonstrate that the adverse interest exception may apply in this case.  In response, Citibank maintains that Okun's acts benefited both himself

and the 1031 Debtors so the adverse interest rule cannot apply.  Citibank's argument, however, does not address Okun's intent.  This is the central inquiry when determining whether a manager has totally abandoned the interests of his company.  The Complaint adequately alleges that Okun totally abandoned representing the interests of the 1031 Debtors and the Court cannot, as a matter of law, determine that Okun did not intend to totally abandon the 1031 Debtor's interests.

The Second Circuit recently examined the "total abandonment" standard a party must satisfy to fall under the adverse interest exception.  In *CBI*, Judge Wesley identified intent as the keystone to determining whether a manager abdicated so completely from representing the interests of the company that his actions cannot be imputed to the company and the adverse interest exception applies.  *Id.* at 451 ("First, it is important to remember that the 'total abandonment' standard looks principally to the intent of the managers engaged in misconduct."). In other words, a manager must intend his actions to advance only his own interests, and not the corporation's, for the exception to apply.  *Id.*  The court further explained that the mere fact that a company gained benefits from the manager's malfeasance does not preclude a fact-finder from determining that the manager's true motivation was diametrically opposed to the interests of the corporation.  *Id.*  ("Evidence that [debtor] *actually benefited* from [debtor's] management's fraud does not make the bankruptcy court's finding that [debtor's] management did not *intend to benefit* the company clearly erroneous.") (emphasis in original); *Cobalt Multifamily Investors*, 2009 WL 2058530, at *4, 6 ("The Second Circuit concluded that a court can find that a corporation's manager 'totally abandoned' a corporation's interests even if the manager's actions also benefited the corporation, because the relevant inquiry is whether the manager *intended* to benefit the corporation." ).  On this point, the district court in *CBI* had reversed the bankruptcy court, which concluded that where a fraud was committed for the purpose of obtaining more

compensation and to preserve the bad actor's control over the company, the adverse interest exception applied. *Bankruptcy Services, Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 247 B.R. 341, 365 (Bankr. S.D.N.Y. 2000). The district court found that some corporate purpose may have been forwarded by the fraud, so the adverse interest might not apply. *Ernst & Young v. Bankruptcy Services, Inc. (In re CBI Holding Co., Inc.)*, 311 B.R. 350, 370 (S.D.N.Y. 2004). The district court further opined that it was "not convinced" that intent should control the application of the exception. *Id.* But Judge Wesley, as indicated above, squarely overruled the reasoning of the district court on this point, finding that the mere fact that a company benefits from an agent's wrongdoing does not prohibit the application of the adverse interest exception and affirmed that the intent of the bad actor was the touchstone to use to determine whether the exception applies.

The Complaint alleges that Okun misappropriated funds to, among other things, purchase luxury assets, acquire additional QIs and to make so-called "lulling" payments. (Compl. ¶ 23.) Moreover, the Complaint claims that Okun took these actions for his own self-interest. (*Id.* ¶ 27.) Other Courts have found similar allegations sufficient to demonstrate that an agent had the intent to totally abandon the interests of the principal. For example, courts have found that allegations that an agent looted company funds to pay for sports cars and construction work on personal property demonstrated that the agent intended to totally abandon his principle's interests. *Cobalt*, 2009 WL 2058530, at *9. Judge Kaplan in *In re Parmalat* concluded that looting company funds almost always satisfies the adverse interest exception. *Bondi v. Bank of America Corp.( In re Parmalat)*, 383 F. Supp. 2d 587, 599 (S.D.N.Y. 2005) (reasoning that looting of company funds is not "in any sense in the interest of the company" and refusing to impute the insider theft of company funds to the company under principles of agency).

31

Moreover, a determination that Okun's actions benefited the 1031 Debtors by somehow

extending the life of the companies does not prohibit a determination that he acted out of total

self-interest.  *See CBI*, 529 F.3d at 451.  Arguably, in the course of committing the fraud, Okun's

actions conferred benefits on the 1031 Debtors including, (i) acquiring more QIs and achieving

economies of scale, (ii) paying 1031 Debtors' operating expenses, and (iii) using new funds to

complete earlier 1031 Exchanges.  (Compl. ¶ 23.)  At this stage of the case, however, the Court

must draw all reasonable inferences in favor of the non-moving party, the Trustee.  *Certain*

*Underwriters at Lloyd's v. Milberg LLP*, No. 08 Civ. 7522(LAP), 2009 WL 3241489, at *2

(S.D.N.Y. Sept. 30, 2009).  And the actions that arguably conferred benefits on the 1031 Debtors

do not definitively show that Okun intended to act in the interests of the company and not his

own.  For example, acquiring new QIs gave Okun additional sources to plunder.  This is not

mere speculation.  The history of these cases, and most significantly Okun's criminal conviction

and 100-year sentence, demonstrate that Okun intended the purchases of the QIs to line his own

pockets and not assist the 1031 Debtors.  Next, paying operating expenses and making

contractual payments to complete certain 1031 exchanges do not support an inference that Okun

intended to benefit the 1031 Debtors.  More plausibly, Okun intended these actions to extend the

life of his scheme, increasing his opportunities to steal from the 1031 Debtors.  Indeed, the

Second Circuit has squarely stated that actions taken by a principal to extend the life of a

corporation do not require a finding as a matter of law that the principal intended to benefit the

corporation.  *CBI*, 529 F.3d at 451.  Other courts agree, holding that a principal's use of stolen

funds to help perpetuate a company is "not inconsistent" with total abandonment of the

corporation's interests.  *Oppenheimer-Palmieri Fund, L.P. v. Peat Marwick Main & Co. (In re*

*Crazy Eddie Secs. Litig.)*, 802 F. Supp. 804, 818 (E.D.N.Y. 1992).

At the motion to dismiss stage it is reasonable to infer from the factual allegations that Okun only intended to benefit himself with his actions. To determine that Okun's looting of the 1031 Debtors, along with acts that may well have only been intended to perpetuate the fraud, was not "totally adverse" to the company could lead to perverse results. Third parties allegedly complicit in an insider's Ponzi scheme should not so easily be able to escape liability by arguing that *any* benefit to the company that perpetuated its existence strips a trustee of standing to recover damages to the company.

In an effort to avoid the application of the adverse interest exception, Citibank argues that an exception to the exception—"the sole actor rule"—applies. Citibank argues that the sole actor rule requires the imputation of Okun's bad acts to the 1031 Debtors and the Trustee even though the adverse interest exception may apply. (Citibank Br. 9.) The Court turns to that argument next.

c.    The Sole Actor Rule and the Innocent Insider Exception

Courts will not apply the adverse interest exception if the sole actor rule applies. *Food Mgmt.*, 380 B.R. at 696. The sole actor rule is an exception to the application of the adverse interest exception and is applicable "where the principal and the agent are one and the same." *Mediators*, 105 F.3d at 827. The sole actor rule has been applied when the manager was also the sole shareholder of the corporation or when all the corporation's management participated in the wrongdoing. *Id.*; *Food Mgmt.*, 380 B.R. at 697. The logic for the sole actor rule is grounded in the rationale for the adverse interest exception. The adverse interest exception exists because a principal being defrauded by an agent cannot be presumed to have knowledge of the agent's fraud. *See Mediators*, 105 F.3d at 827 ("[T]he adverse interest exception is to a presumption that an agent has discharged the duty of disclosing material facts to the principal. Under New York

law, where the agent is defrauding the principal, such disclosure cannot be presumed because it would defeat—or have defeated—the fraud."). Thus, under the adverse interest exception, the agent's bad acts are not imputed to the principal. But, there is no reason for the adverse interest exception to exist when the principal and the agent are essentially the same entity. In these instances the agent's knowledge must be imputed to the principal "because the party that should have been informed was the agent itself albeit in its capacity as principal." *Grumman Olson*, 329 B.R. at 425 (quoting *Mediators*, 105 F.3d at 827)). Thus, where the principal is a mere alter ego of the agent, the sole actor rule bars the application of the adverse interest exception and the bad acts of the agent are imputed to the principal.

The innocent insider exception is a corollary to the sole actor rule. If other managers or owners—besides the bad actor—control the company, it necessarily follows that the company and the agent are not the same entity; because the principal and the agent are not the same, the sole actor rule cannot not apply. *Mediators*, 105 F.3d at 827; *see Ernst & Young v. Bankr. Servs., Inc. (In re CBI Holding Co., Inc.)*, 311 B.R. at 372–73 (district court opinion). The touchstone of the innocent insider exception is control. If an innocent person inside the corporation had the power to stop the fraud, the agent and the company are not mere alter egos, so the sole actor rule cannot apply. *See Cobalt*, 2009 WL 2058530, at *10 ("The presence of an innocent person or entity that could have stopped the fraud, as is the case here, defeats the sole actor exception."); *Silverman v. H.I.L. Assocs. Ltd. (In re Allou Distribs., Inc.)*, 387 B.R. 365, 387 (Bankr. E.D.N.Y. 2008) (noting that "a trustee must allege that an inside decision-maker or shareholder was innocent of the agent's misconduct, unaware of it, and able to prevent it had the misconduct been known" for the innocent actor exception to apply) (quoting *Ernst & Young v. Bankr. Servs. Inc. (In re CBI Holding Co., Inc.)*, 311 B.R. at 371 (district court opinion))

(internal quotation marks omitted); *Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.)*, 278 B.R. 28, 37–38 (E.D.N.Y. 2002) (observing that certain courts, before applying the sole actor rule, search allegations in the complaint for innocent insiders "who could or would have prevented [a] fraud").

While other courts have employed the innocent insider exception as an independent exception to both the *Wagoner* rule and *in pari delicto* doctrine, this Court is skeptical that this is the law. New York state cases do not recognize "innocent insider" as an independent exception that stands alone from the adverse interest exception. *See Bennett Funding*, 336 F.3d at 100 (applying New York law and assuming the applicability of an "innocent insider" exception). Moreover, the Second Circuit recently acknowledged the force of Judge Wood's analysis of the so-called innocent insider exception. *CBI*, 529 F.3d at 447 n.5 ("Judge Wood's analysis of the innocent insider exception and its likely genesis as a product of courts' confusion regarding the relationship between the normal rule of imputation, the adverse interest exception to that rule, and the sole actor exception to that exception is extremely persuasive."). Judge Wood explained that under typical agency theory, the mere presence of so-called innocent insiders is irrelevant to the imputation of the agent's bad acts to the company. *Ernst & Young v. Bankr. Servs. Inc. (In re CBI Holding Co., Inc.)*, 311 B.R. at 373 (district court opinion) ("Thus, unless the adverse interest exception to the presumption of imputation applies, it is immaterial whether innocent insiders exists; the agent is still acting on behalf of the company, and his actions will be imputed to the company notwithstanding the existence of those innocent insiders."). The acts of all agents, regardless of the presence of innocent insiders, are imputed to principals unless the agent totally abandoned the interests of the principal and was acting in his own self-interest (*i.e.* the adverse interest exception applies). *Id.* But, if innocent decision makers exist within the

company with authority to stop the fraud, the company and the agent are not the same entity, so the sole actor rule cannot apply. *Id.* ("When the innocent insiders lack authority to stop the fraud, the 'sole actor' exception to the 'adverse interest' exception applies, and imputation is thus proper, because all *relevant* shareholders and decisionmakers were involved in the fraud. However, when the innocent insiders possessed authority to stop the fraud, the 'sole actor rule' does not apply, because the culpable agents who had totally abandoned the interests of the principal, and were thus acting outside of the scope of their agency, were not identical to the principal."); *see also* Jonathan Witmer-Rich & Mark Herrmann, *Corporate Complicity Claims: Why There is No Innocent Decision-Maker Exception to Imputing an Officer's Wrongdoing to a Bankrupt Corporation*, 74 TENN. L. REV. 59–80 (2006). With this analytical framework in mind the Court turns to the allegations and arguments.

Citibank argues that because Okun was the "sole member of the 1031 Tax Group," which owned, directly or indirectly, all of the 1031 Debtors, the sole actor rule applies. (Citibank Br. 9.) According to Citibank, Okun's role as sole shareholder alone is sufficient to have his bad acts imputed to the company under the sole actor rule. Additionally, Citibank argues that Okun's conduct should be imputed because he was either the sole manager or director of the 1031 Debtors. (*Id.* (citing *In re The 1031 Tax Group*, No. 07-11448(MG), 2007 WL 2085384, at *1 (Bankr. S.D.N.Y. 2007).) The Trustee does not dispute Okun's ownership of the 1031 Debtors, but instead argues that other managers existed who would have halted Okun's misdeeds if given the opportunity. The Trustee maintains that because there were other managers at the company who would have halted the fraud if given the opportunity, Okun could not have been a sole actor. Thus, according to the Trustee, Okun's bad acts cannot be imputed to the corporation under the sole actor rule. (Trustee Opp. 15–19.)

As an initial matter, Citibank's argument carries much force.  The Second Circuit has stated on multiple occasions that the sole actor rule applies when "the principal is a corporation and the agent is its sole shareholder."  *CBI*, 529 F.3d at 453 n.9 ("Thus, the sole actor rule applies . . . in the corporate context, where the 'principal is a corporation and the agent is its sole shareholder.'") (quoting *Mediators*, 105 F.3d at 827).  While the Second Circuit has not so far ruled that the sole actor rule applies without exception in every instance where the principal is a corporation and the bad actor is the sole shareholder, that may well be the rule the court ultimately adopts.  *See Mediators*, 105 F.3d at 827 (intimating that the innocent insider exception can never apply where a sole shareholder is alleged to have stripped the company of assets).  Further, when all shareholders are bad actors, and only innocent managers exist, the rationale for the innocent insider exception is severely diminished.  As stated by Judge Wood in the district court decision in *CBI*:

> The rationale behind the innocent insider exception appears to be that, where only some members of management are guilty of the misconduct, and the innocent members could and would have prevented the misconduct had they known of it, the culpability of the malefactors should not be imputed to the company because that imputation would punish innocent insiders (*e.g.* non-culpable shareholders) unfairly.

*CBI*, 311 B.R. at 372.  It is unclear how it is "unfair" to the innocent managers to impute the bad acts of a sole shareholder to the corporation.  Managers and other company employees have no ownership interests that would be damaged in the fraud.  It would, however, be unfair to minority company owners to have the bad acts of a shareholder imputed to the entire company, so long as the minority shareholder had sufficient mechanisms in place to halt the fraud.

As acknowledged during oral argument in this case, no court in this Circuit has applied the innocent insider exception to the sole actor rule where a sole shareholder committed the fraud.  (*Hr'g* Tr. 19–20, 49, Sept. 10, 2009, ECF # 30.)  Nevertheless, the Court declines at this

stage of the proceedings, at least, completely to foreclose the possibility, as a matter of law, to apply the innocent insider exception in all cases in which the corporate entities are owned by a sole shareholder who is the primary wrongdoer.[8]  Assuming, however, that the innocent insider exception can apply when a sole shareholder defrauds his principal company, the Complaint fails to plead that the innocent insiders in this case had sufficient authority to apply the exception.

The level of control and authority an employee must have to warrant the application of the innocent insider exception is not clear.  It is, however, apparent from the case law that the innocent insider must have had the power to stop or prevent the fraud, and would have taken those steps to halt the wrongdoing if he/she had proper knowledge.  *See, e.g.*, *Colbalt*, 2009 WL 2058530, at *10; *In re Allou*, 387 B.R. at 387; *In re Sharp*, 278 B.R. at 38–39.  As the Second Circuit indicated in *Bennett Funding*, for the innocent insider exception to apply the insiders must have had actual power to stop the alleged fraud.  336 F.3d at 101 (observing that the innocent insiders must have a more than a "metaphysical" ability to stop the fraud for the exception to apply).  There, the court determined that the exception couldn't apply when the innocent insider did not have power to do anything to halt the fraud.  The court reasoned that the innocent insider exception is not satisfied by a "would-a, could-a, should-a test." *Id.*  The hope or even expectation that some honest employee with knowledge of the fraud would report the

---

[8]        The reality, of course, at least as presented to a bankruptcy court in the usual case, is that the creditors are often the residual victims of a sole shareholder's fraud, allegedly with the assistance of third-parties, and are left without sufficient estate assets to satisfy their claims.  In a case such as this one, where the 1031 exchange participants have asserted their own claims in the MDL proceedings, at least that group of creditors may have available remedies.  Other general unsecured creditors of the Debtors may not be able to maintain a claim against third-parties to recover their losses.  *See Pereira,*, 2001 WL 243537, at *11 ("where the injury is to all creditors as a class, it is the creditors who lack standing and the Trustee who may bring a claim based on that generalized injury") (citations omitted).  Such circumstances may exert inexorable pressure on bankruptcy courts to try to fit a square peg in a round hole, searching for a doctrinal basis to avoid application of the *Wagoner* rule or the *in pari delicto* doctrine by applying the innocent insider exception to the sole actor rule so that the adverse interest exception is triggered, at least to the extent of finding that the trustee has standing.  The state-law equitable defense of *in pari delicto* may still bar recovery even if the trustee has standing to assert the claims.

matter to law enforcement authorities cannot be a sufficient basis to invoke the exception; actual corporate power or authority by an innocent insider is required.

The Trustee's Complaint marshals limited and conclusory allegations regarding the power of insiders to halt Okun's fraud. A scant three paragraphs of the Complaint can be read as an effort to invoke the innocent insider exception. (Compl. ¶¶ 28–30.) The first paragraph offers the bare legal conclusion that certain managers and supervisors of the 1031 Debtors did not know about Okun's conduct. These managers allegedly "had sufficient authority" to stop the misconduct, and would have done so if aware of Okun's malfeasance. (*Id.* ¶ 28.) This paragraph is essentially a restatement of the standard required for the application of the innocent insider exception. Courts are not required to accept such legal conclusions, even when clothed in factual garb, as true. *Iqbal*, 129 S.Ct. at 1949–50 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Frith v. Hill*, No. 07 Civ. 5899(JSR), 2009 WL 3073716, at *16 (S.D.N.Y. Sept. 23, 2009) (refusing to credit general conclusory legal allegations at the motion to dismiss stage).

The Trustee fares slightly better with his next two paragraphs. The Trustee gives the names and titles of two alleged innocent insiders who purportedly "had sufficient authority to stop the Misconduct." (Compl. ¶¶ 29–30.) First, the Trustee claims that Janet Dashiell ("Dashiell"), as the President and Chief Executive Officer of the 1031 Tax Group, had the proper authority to stop Okun, as demonstrated by her (i) reporting the misconduct, and (ii) safeguarding certain Exchange Deposits, eventually causing Okun's fraud to come to a halt. (*Id.* ¶ 29.) Next, the Trustee claims that Daniel McCabe ("McCabe"), the 1031 Exchange Production Manager, had the authority to stop Okun due to his supervision and management of exchange

funds for IXG and other 1031 Debtors.  (*Id.* ¶ 30.)  Once aware of the fraud, McCabe allegedly refused to authorize additional transfers of Exchange Deposits.  (*Id.*)

These factual allegations, while more than mere legal conclusions, do not nudge the Trustee's claim that the innocent insider exception applies "across the line from conceivable to plausible." *Iqbal*, 129 S.Ct. at 1950–51.  Judge Knapp, remanding Magistrate Judge Peck's report and recommendation on a motion to dismiss, stated that for a complaint to validly allege that the innocent insider exception applies, it must (i) identify the allegedly innocent insider; and (ii) explain how those persons could and would have been able to end the fraud if they had proper notice of the wrongdoing. *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.*, 212 B.R. 34, 36 (S.D.N.Y. 1997).  On remand, Judge Peck assiduously applied this test, carefully examining whether the innocent insiders had the ability to halt the fraud. *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.*, 994 F. Supp. 202, 208–14 (S.D.N.Y. 1998).  Judge Peck did not accept the mere allegation that the insiders could have stopped the fraud by (i) hiring an outside accounting firm, or (ii) disclosing the fraud to the Securities Exchange Commission. *Id.* at 209.  Instead, the court probed whether the insider actually had the authority to—and in fact could—halt the fraud.  Specifically, Judge Peck analyzed whether the information the insider would purportedly have shared to stop the fraud was protected by the company's attorney-client privilege. *See id.* at 212 ("the issue is whether [the insider], believing that there was wrongdoing by the company's officer-directors, voluntarily could disclose to the SEC privileged information already in his possession").

Here, while the Trustee has identified at least two purportedly innocent insiders, the Complaint does not indicate how these persons would have ended the fraud, or whether they had the power to do so.  Instead, the Complaint merely alleges that Dashiell "had sufficient authority

to stop the Misconduct" and supports this legal conclusion with the lone factual allegation that her actions allegedly ended the fraud.  (*See* Compl. ¶ 29.)  With regards to McCabe, the Complaint gives an abbreviated example of his managerial tasks, stating that he managed certain exchange funds and "supervised exchange transactions."  The Complaint concludes that he too "had sufficient authority to stop the Misconduct" and claims that his actions eventually stopped Okun's fraud.  (*Id.* ¶ 30.)  While this suggests that both McCabe and Dashiell had the authority to end the fraud, it is barren of any factual allegations regarding their respective corporate powers or what earlier acts they could have taken to end the fraud.  While their corporate titles are given, these titles are merely suggestive of authority.  Not every CEO, CFO, or employee has the same sets of authorities and responsibilities.  *See, e.g.*, N.Y. BUS. CORP. LAW § 202(a)(1) (McKinney 2007) ("Each corporation . . . shall have power in furtherance of its corporate purposes . . . .  To elect or appoint officers, employees and other agents of the corporation, define their duties . . . ."); DEL. CODE ANN. tit. 8, § 142(a) (2008) ("Every corporation organized under this chapter shall have such officers with such titles and duties as shall be stated in the bylaws . . . .").  The cursory references to McCabe's managerial duties merely indicate his day-to-day responsibilities, not whether he actually had the authority to halt Okun's fraud.

In comparison, parties successfully claiming that the innocent insider exception applies at the motion to dismiss stage have alleged far more in their pleadings.  For example, in *In re Sharp Int'l Corp.*, the complaint included specific allegations regarding the powers of the allegedly innocent insider including (i) a right to inspect Sharp's books and records; (ii) the right to veto certain corporate transactions; and (iii) a right to receive audited and unaudited financial statements.  278 B.R. at 37.  Similarly, in *In re Allou Distributors, Inc.*, the trustee made specific allegations that the innocent shareholders would have exercised their derivative rights to halt the

fraud and also report the fraud to the SEC.  387 B.R. at 391.  Most recently, in *Cobalt Multifamily Investors I, LLC*, the plaintiff specifically alleged that the purportedly innocent shareholders had the authority under their shareholder agreements to remove the managers who were defrauding the company.  2009 WL 2058530, at *2.  Only after noting these specific allegations did the respective courts indicate that the complaints adequately alleged the innocent insider exception.

Because the Trustee's Complaint fails to make any specific factual allegations regarding the authority of McCabe or Dashiell to halt Okun's fraud, this Court must dismiss the Complaint. As explained above, the pleadings demonstrate that both the adverse interest exception and the sole actor rule apply; the Complaint is deficient in triggering the innocent insider exception to the sole actor rule.  Thus, under the *Wagoner* rule the Trustee has not demonstrated prudential standing to bring this claim, or, alternatively, the Trustee has failed to state claim under Rule 12(b)(6).  The same reasoning would bar the Trustee from recovery under the *in pari delicto* doctrine.

### D.     Leave to Amend

The Trustee may still be able to plead prudential standing in the face of the *Wagoner* rule. Assuming the innocent insider exception to the sole actor rule may still apply in instances where the agent is the sole shareholder of the principal company—an issue not decided today—the Trustee may be able to amend the Complaint to allege that the innocent insiders had sufficient authority to halt Okun's fraud.  During oral argument, the Trustee's counsel asserted that additional information regarding the authority of McCabe and Dashiell is readily available to assist in drafting an amended complaint.  (*Hr'g* Tr. 58–60, Sept. 10, 2009, ECF # 30.)  Much of Okun's fraud in this case was accomplished by wire transferring funds from Citibank (and other

bank) accounts to Okun's other accounts, here allegedly with Citibank's wrongful complicity. It is not clear what authority Okun had to direct these transfers, and more importantly, what authority Dashiell had as President and CEO with respect to approval or disapproval of wire transfers.

Lastly, the Court observes that the result here will not necessarily be inequitable for the exchange participants. Citibank admits, both in its briefing as well as during oral argument, that the precise claim the Trustee seeks to assert here—that Citibank aided and abetted in Okun's looting of funds—belongs to the creditors of the estate and not the Trustee. (Citibank Br. at 2; *Hr'g* Tr. 43–46, Sept. 10, 2009, ECF # 30 ("THE COURT: So you believe that the claim for aiding and abetting a breach of fiduciary duty resulting in the theft by Okun of funds in the 1031 accounts at Citibank is a claim that can be asserted by the exchangers? Mr. Blocker: Yes.").) This claim is currently being litigated in the *Hunter* class action on behalf of a putative class of exchange participants who lost money entrusted to the 1031 Debtors while they waited for their exchange transactions to occur. During oral argument, the Trustee's counsel expressed concern whether this claim would be vigorously litigated in California. (*Hr'g* Tr. 73–77, Sept. 10, 2009, ECF # 30.) This concern appears misplaced, particularly in light of the cooperation and sharing agreement subsequently approved by this Court and Judge Ware. Moreover, Citibank does not appear to be taking alternative positions in the two cases. While Citibank has moved to dismiss the *Hunter* complaint, it does not argue that the claims do not belong to the creditors. (*See* Memorandum of Points and Authorities in Support of Citibank, N.A.'s Motion to Dismiss, *Hunter v. Citibank, N.A.*, No. 09-cv-02079-JW (N.D. Cal. Oct. 2, 2009) (ECF # 132).) Thus, it appears that the merits of the aiding and abetting claim against Citibank will be tested in court.

## CONCLUSION

For the forgoing reasons Citibank's motion to dismiss is granted with leave to amend.

The Trustee demonstrated that he has adequate constitutional standing to bring the aiding and

abetting claim, but he has not pleaded sufficient facts to demonstrate prudential standing under

the *Wagoner* rule.  The Trustee may file an amended complaint within 30 days from the entry of

this Opinion and Order.  Citibank shall respond the amended complaint within 30 days

thereafter.  Entry of this Opinion and Order shall not relieve the parties of their obligations under

the Stipulation and Amended Scheduling Order (ECF # 34), unless and until an order closing this

case is entered.

**IT IS SO ORDERED.**

Dated: December 3, 2009
     New York, NY

                    __**/s/Martin Glenn**_____
                       MARTIN GLENN
           United States Bankruptcy Judge